UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DENNIS McLAIN as Personal
Representative of the Estate of Anthony
Gilhouse,

        Plaintiff,

v.

SECURE CARE, INC., et al.,

        Defendants.

_____/

Case No. 04-73744

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT [98]**

This action arises out of the sudden death of a 17-year-old juvenile resident, Anthony

Gilhouse, at the Maxey Boy's Training School ("Maxey") in Whitmore Lake, Michigan, on

June 11, 2001, as a result of an asthma attack.  Plaintiff's complaint, brought pursuant to

42 U.S.C. § 1983, alleges that Defendants' deliberate indifference to Gilhouse's serious

medical needs violated his Eighth and Fourteenth Amendment rights.  The only remaining

Defendants in this action are (1) SecureCare, Inc., the entity that contracted with

Michigan's Family Independence Agency ("Agency") to provide certain health care services

to Maxey juveniles; (2) Kathy Laginess, R.N., President of SecureCare; (3) James Garrett,

R.N., SecureCare employee and Health Services Clinical Administrator at Maxey; (4) Anne

Latulip-Gariepy, L.P.N., SecureCare employee on the nursing staff at Maxey; and (5) Dr.

Parker, who served, under contract with SecureCare, as the primary care physician for

Maxey juveniles.[1]

This matter is presently before the Court on Defendants' motion for summary judgment.  For the reasons stated below, Defendants' motion is GRANTED.

## I.    Facts

About 580 juvenile males reside at Maxey, a facility run by the Agency.  The Agency contracted with Defendant SecureCare, a private company, to provide certain health services to Maxey residents.  The contract in effect on June 11, 2001, provided in relevant part that:

> The Contractor shall:
>
> a.  Oversee the medical programs at . . . Maxey . . . .  Provide a prevention focused medical service at each site including required and medically indicated immunizations.  Examine all youth as they are admitted (this is statutory).  Treat various illnesses and injuries as they occur.  Oversee the dispensing and disposal of medication.  Keep accurate charts and records on patients.  Prescribe medications as needed by youth.  Be on-call by telephone should an emergency occur.

(Defs.' Ex. A, 4/1/98 Contract ¶ II.D.1.a.)  Defendant Kathy Laginess, R.N., SecureCare's President, executed the contract.

At all relevant times, Defendant James Garrett, was a registered nurse and a SecureCare employee working as the Health Services Clinical Administrator at Maxey.

---

[1]Numerous Agency employees were also named as Defendants but have been dismissed with prejudice pursuant to a settlement agreement where the State of Michigan agreed to pay Plaintiff Estate $700,000.  (2/13/07 Stip. and Order of Dismissal, Docket No. 104.)

Other Defendants have been dismissed without prejudice.  (10/7/05 and 2/1/06 Stip. and Orders of Dismissal dismissing Defendants Kay Ray (Farkas), Carol Timmer, Yusif Barakat, Sheila Brown, Eric Hammer, A'lynn King, Krisi Nixon, T.J. Osborne, Maralene Reeves, Linda Schwartz, Julia Shareef, and E. Martinus Whitfield.)

Defendant Anne Latulip-Gariepy was a Licensed Practical Nurse and SecureCare employee working on the nursing staff at Maxey. Defendant Dr. Parker, a board certified internist, was under contract with SecureCare to serve as the primary care physician for Maxey residents.

Agency staff at Maxey drafted and instituted, without input from SecureCare, Standard Operating Procedures for the handling of prescription drugs ("SOP 4013"). (Yaple Dep. at 29-41, 98.) SecureCare, identified as "Health Services" in SOP 4013, was to order all drugs prescribed by Dr. Parker through the pharmacy contractor, PCA-Corrections. SecureCare was also responsible for assuring that the medications were received and delivered to the appropriate Maxey staff. Maxey employees, called Youth Specialists, were responsible for providing each dose of medication to juvenile patients, for documenting each dose received or refused on a medication administration record ("MAR"), and for notifying their supervisors if patients did not take their medications via an unusual incident report ("UIR"). Maxey Shift Supervisors were responsible for reviewing the UIRs on a daily basis and for notifying Maxey superiors and SecureCare staff about UIRs. Maxey's residence hall Program Managers were responsible for weekly audits of the MARs and for taking necessary and appropriate actions when records were incomplete or indicated non-delivery. These actions included notifying SecureCare staff. Maxey Shift Supervisors were also responsible for regular audits of the MARs to check for completeness and for taking the same actions as Program Managers if medications were not being delivered. (Pl.'s Ex. HH, Dr. Greifinger Expert Report at ¶¶42-45; Pl.'s Ex. N, SOP 4013.)

"When medications are finished, discontinued, dose-adjusted, or [a] youth is released," Maxey Youth Specialists must complete MARs. These MARS are then turned

3

over, along with medication containers and any leftover medication to Health Services. SecureCare employees in Maxey Health Services were required to complete a UIR if the drug quantity they received did not match that listed on the MARs. (Pl.'s Ex. N, SOP 4013 at 7.) Health Services was also required under Maxey Standard Operating Procedure 4017 ("SOP 4017") to maintain medical records for each Maxey resident. Those records were to include MARs for prescribed medications, among other things. (Pl.'s Ex. O, SOP 4017 at 6.)

Anthony Gilhouse, a Maxey resident since 1998, suffered a fatal asthma attack on June 11, 2001, while he was on his way to his off-site employment at Wal-Mart. He was accompanied by a Maxey employee who advised him to use his Albuterol inhaler and then called 911. He was transported to the hospital by EMS and died that same day. He was 17 years old.

Defendants' motion for summary judgment argues that Plaintiff has not and cannot present evidence establishing that they were deliberately indifferent to Anthony Gilhouse's serious medical needs. Specifically, they argue that Plaintiff's evidence of negligence or breach of contract is insufficient to rise to the level of a constitutional tort.

## II.    Summary Judgment Standard

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an

4

element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III.   Analysis - Deliberate Indifference to Serious Medical Needs

To succeed on his § 1983 claims alleging violations of the Eighth and Fourteenth Amendments, Plaintiff must establish that the remaining Defendants acted with "deliberate indifference" to Anthony Gilhouse's serious medical needs. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). Showing negligence in treating Anthony Gilhouse is not enough. "A complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). *Accord, Farmer*, 511 U.S. at 835-36.

5

A prisoner's Eighth Amendment claim of deliberate indifference to serious medical needs has both an objective and subjective component. *Farmer*, 511 U.S. at 834. The objective component requires the existence of a sufficiently serious medical need. *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 834). To satisfy the subjective component, Plaintiff must establish that Defendants (1) "subjectively perceived facts from which to infer substantial risk to the prisoner," (2) "did in fact draw the inference," and (3) "then disregarded that risk." *Id.* "Emphasizing the subjective nature of this inquiry, the Supreme Court has noted that 'an official's failure to alleviate a significant risk that *he should have perceived but did not*, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.'" *Id.* (quoting *Farmer*, 511 U.S. at 838 and adding emphasis). Nonetheless, "a prison official may 'not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.'" *Id.* (quoting *Farmer*, 511 U.S. at 843, n. 8).

This subjective test "is meant to prevent the constitutionalization of medical malpractice claims." *Id.* "When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Id.* As the Sixth Circuit recently affirmed, "'[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.'" *Jennings v. Al-Dabagh, M.D.*, NO. 03-2046, 2004 WL 957817, *1 (6th Cir. April 29, 2004) (quoting *Westlake v. Lucas*, 537

6

F.2d 857, 860 n.5 (6th Cir. 1976)).

The objective component of Plaintiff's claim is not at issue here.  It is not disputed that Defendants were aware that Anthony Gilhouse had asthma, was taking prescription drugs for his asthma, had suffered acute asthmatic episodes while at Maxey, and had been transported to the hospital in August 2000 for an acute asthmatic episode.  (Dr. Parker Dep. at 52, 57, 60, 64, 82-85; L.P.N. Latulip-Gariepy Dep. at 55, 101; and R.N. Garrett Dep. at 96, 98.)

Rather, Defendants argue that Plaintiff cannot show that a genuine issue of material fact exists as to the subjective component of Plaintiff's claims that each of the Defendants was deliberately indifferent to Anthony Gilhouse's serious medical needs.  The Court begins by examining the evidence presented on the subjective component of Plaintiff's claim against Dr. Parker.

**A.  Dr. Parker**

Plaintiff argues that Dr. Parker acted with deliberate indifference to Anthony Gilhouse's serious medical needs because he failed to adequately monitor his asthma by: (1) performing regular peak flow monitoring, (2) checking his asthma at each appointment; (3) asking at each visit how often he used his Albuterol; and (4) reviewing his MARs or otherwise assuring that he was receiving and taking all his prescribed medication. Defendants respond that Plaintiff presents evidence supporting negligence or medical malpractice claims, but not evidence that Dr. Parker subjectively perceived facts from which he could infer a substantial risk to Anthony Gilhouse, that Dr. Parker in fact drew that

7

inference, and then disregarded the risk.  This Court agrees with Defendants.[2]

Anthony Gilhouse's medical chart reveals that in June 1999, he was a "healthy male with asthma."  (Defs.' Ex. D, Bates No. 42.)  Dr. Parker began treating Mr. Gilhouse at Maxey in March 2000.  (Dr. Parker Dep. at 65.)  He described Mr. Gilhouse's asthma condition as "mild persistent" and maybe "moderate" as well as "troublesome."  (*Id.* at 49, 60.)  Dr. Parker prescribed three inhalers to treat Anthony Gilhouse's asthma:  Serevent inhaler, take 2 puffs twice daily; Flovent inhaler, take 2 puffs twice daily; and Albuterol inhaler, take 2 puffs four times a day as needed.  (*Id.* at 57, 95-96, Defs. Ex. D, Bates No. 100, 117.)  As medical director and primary care physician at Maxey, Dr. Parker testified that he was responsible for providing medical treatment to residents and prescribing medication.  He did not have responsibility for actually administering medication to residents or for running the health clinic. (Parker Dep. at 11-12.)  Maxey Youth Specialists were responsible for administering medication to youth residents, and Garrett, as Clinical Administrator of Health Services, was responsible for running the health clinic.

While under Dr. Parker's care, Mr. Gilhouse was hospitalized for an asthma attack on August 8, 2000.  (Dr. Parker Dep. at 52, 64, 83-84; Defs.' Reply Ex. 6 at 02.)  He was also treated at Maxey by Dr. Parker after he suffered an asthma attack while running on October 2, 2000 without access to his Albuterol inhaler.  (Dr. Parker Dep. at 94-96; Defs.' Ex. D at Bates No. 117.)  Mr. Gilhouse told Dr. Parker that he felt better after he used his nebulizer

---

[2]Plaintiff's experts' opinions that Defendants were "deliberately indifferent" in their treatment of Anthony Gilhouse is not admissible.  As the Sixth Circuit observes, "'deliberate indifference' is a legal term . . . .  It is the responsibility of the court, not testifying witnesses, to define legal terms.  [An] expert's testimony in this regard invade[s] the province of the Court."  *Berry v. City of Detroit,* 25 F.3d 1342, 1353 (6th Cir. 1994).

8

machine.  Dr. Parker advised him at that time to use his Albuterol inhaler before engaging in any sport activity.  (Dr. Parker Dep. at 94-95.)  Mr. Gilhouse did not tell Dr. Parker that he regularly had problems with his asthma when playing sports.  (Dr. Parker Dep. at 63.)

On November 2, 2000, Dr. Parker saw Mr. Gilhouse for a recheck on his asthma.  Mr. Gilhouse told Dr. Parker that he was doing well, that he used his Albuterol inhaler for sports, but admitted that he had not been using his Flovent or Serevent inhalers.  Dr. Parker advised him of the importance of taking all of his medications as prescribed.  (Defs. Ex. D at 117; Dr. Parker Dep. at 12-13, 15-16, 95-96.)  R.N. Garrett was present during this examination and witnessed this exchange.  (Garrett Dep. at 96-97.)         Dr. Parker understood that Flovent and Serevent inhalers required continuous use to keep the air passages open thus lessening the severity of an asthma attack.  (Dr. Parker Dep. at 57.)  He also understood that, without continual use of the Flovent and Serevent inhalers, Anthony Gilhouse's air passages could become swollen and restricted and that the Albuterol inhaler would not be able to sufficiently open the air passages during a major asthma attack.  (*Id.* at 57-58.)

From January 2001 until his death on June 11, 2001, Dr. Parker saw Mr. Gilhouse at least eight times for a variety of reasons, including back and foot pain, asthma, allergies, an injury to the right hand, and a fungal rash.  (Defs. Ex. D, medical records.)  Dr. Parker did not have Mr. Gilhouse perform regular peak flow measurements.  It was his opinion that this was not required as Mr. Gilhouse appeared to be doing well, was living in a controlled environment, and was able to frequently play sports without any problem.  (Dr. Parker Dep. at 62-63, 83, 113.)

9

Other than the November 2, 2000 visit when Dr. Parker advised Mr. Gilhouse of the importance of taking all of his prescribed medicine, Dr. Parker testified that he was not aware that Mr. Gilhouse was refusing or otherwise not getting his prescribed medication. (Dr. Parker Dep. at 24-25, 61, 95-96, 114.)  It was his understanding that each inhaler he prescribed for Mr. Gilhouse was continually and automatically being refilled.  (Dr. Parker Dep. at 82.)  He was never told that there was a problem with Maxey residents getting the medication he prescribed.  (Dr. Parker Dep. at 22, 112.)  He was not aware of the existence or use of MARs at Maxey or of Maxey's standard operating procedures concerning the administration of medicine to residents.  (*Id.* at 20, 27, 110-111.)  He did recall R.N. Garrett complaining to him about how prescribed medication was being administered by the Maxey staff, but was not sure what Garrett meant when he said he was not happy with the procedure.  (*Id.* at 112.)  Dr. Parker also did not get the results of PCA audits as that was R.N. Garrett's job.  (Dr. Parker Dep. at 47-48.)

Despite Plaintiff's arguments to the contrary, evidence of negligence in Dr. Parker's treatment of Anthony Gilhouse's asthma is not enough.  *See Estelle*, 429 U.S. at 106.  As the Supreme Court emphasized, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."  *Farmer*, 511 U.S. at 838.  In cases like this, where the dispute is over the adequacy of medical treatment, the "federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."  *Jennings*, 2004 WL 957817 at *1 (internal quote and citation omitted).  Accordingly, Plaintiff's § 1983 claims against Dr. Parker are dismissed.

The Court now considers Plaintiff's claims against L.P.N. Anne Latulip-Gariepy, a

10

clinical nurse at Maxey's Health Services and SecureCare employee.

### B. L.P.N. Anne Latulip-Gariepy

Plaintiff argues that L.P.N. Latulip-Gariepy acted with deliberate indifference to Anthony Gilhouse's serious medical needs because she failed to adequately assure that he was receiving all his prescribed medicine despite the fact that she should have known of that possibility from (a) her review of MARs and medications returned from Maxey Youth Specialists, (b) Nurse Garrett's complaints to her about incomplete MARs (Garrett Dep. at 68-70), and (c) her involvement with one PAC audit on August 23, 2000 (Pl.'s Ex. W, X re: 8/23/00 PAC audit).   Defendants respond that there is no admissible evidence that Ms. Latulip-Gariepy was subjectively aware of and disregarded the fact that Anthony Gilhouse was not receiving his prescribed medication and was thus at a substantial risk of suffering a fatal asthma attack.   This Court agrees.

R.N. Garrett, Maxey's Health Services' Clinical Administrator, described how MARs and returned prescription drugs and drug containers were monitored.   Sporadically, about every week, Health Services would receive numerous MARs and drug containers for any number of the Maxey residents taking prescribed medications.   Maxey had approximately 500 youth residents and many fell in this category.   The MARs were reviewed by both Garrett and L.P.N. Latulip-Gariepy.   The MAR was supposed to be returned with any remaining medication or an empty pack.   Garrett and Latulip-Gariepy would check to see if things matched up.   If they did not, they would fill out a UIR.   The predominant problem they found was that they would have empty drug packages but not enough entries on the MARs showing when the prescribed medicine was administered to the youth.   (Garrett Dep. at 70, 150-153.)   They also received back inhalers that were not empty.   (Garrett Dep. at

11

77.)  Garrett often had discussions with Latulip-Gariepy about the MARs not being filled out properly.  (Garrett Dep. at 68-69.)

Ms. Latulip-Gariepy describes her duties as to returned MARs and medications more precisely.  First, she separates out the time period when old MAR forms were used and when new MAR forms were in use, around March 2001.  She testified that she was not asked to reconcile the returned prescription drug packages with corresponding MARs to determine whether prescribed medication was being properly administered until after the new MAR form was put into use.  (Latulip-Gariepy Dep. at 22-24.)  With the new MARs, she would look for blank spaces.  (*Id.* at 50.)  If the returned medication did not reconcile with the MAR, she sent it to Garrett.  (*Id.* at 50-51.)  After reviewing and reconciling a MAR, she would place a check mark on it.  (*Id.* at 51-53.)  She further testified that, when the new MARs were in effect, Maxey employees who were responsible for administering prescribed medicine to youth residents were also responsible for reviewing MARs daily.  (*Id.* at 77.)

When the old MARs were in use, she described her duties as follows.  There was a separate MAR for each medication prescribed.  So if one youth had multiple prescriptions, there would be multiple MARs.  (*Id.* at 26-28.)  The MARs and returned medication containers would arrive randomly, in random order, and in random numbers.  (*Id.* at 26.)  When they arrived, she would:  (1) separate the MARs from the returned medications; (2) take the sticker with the patient's name off the returned, unused medications, place the sticker on a piece of paper supplied by the pharmacy, and return both to the pharmacy; and (3) then put the MARs in a file in no particular order for filing by the secretary.  (*Id.* at 24, 28-29, 154-56.)  She was not required under the old system to write down what quantity of medication was being returned.  (*Id.* at 155.)  It was not her duty to review these old

12

MARs forms so as to reconcile them in any way with the returned medication.  She did not match up the name on the MAR with the name on the returned medication, and did not notice if there were blank spaces on the MARs.  (*Id.* at 24-25, 28-29.)  Returned inhalers were always thrown out and not returned to the pharmacy for sanitary reasons, and she was not required to and did not determine whether the returned inhalers were empty.  (*Id.* at 29-30, 156-57.)  She testified that, while the old MAR system was in operation, she had not formed an opinion one way or the other about its adequacy.  (*Id.* at 32-33.)  She was aware, however, that Garrett thought the old system was a mess.  (*Id.*)

Under the old MAR system, Latulip-Gariepy knew to refill prescriptions when Maxey staff would fax a refill request over to Health Services and the refill order was then faxed to the pharmacy.  MARs did not accompany refill requests.  (*Id.* at 53-54.)

As to Anthony Gilhouse, Ms. Latulip-Gariepy testified as follows.  She knew that he had asthma and had been hospitalized in August 2000 for an acute asthmatic episode, but did not recall receiving any UIRs that he had refused to take his medication, was not told by any Maxey employee that he was refusing his medication, and was not told by Anthony Gilhouse that he didn't want to take any of his medications.  (*Id.* at 55, 74, 101, 127.)  Because she did not review names on MARs under the old system, there is no evidence that Ms. Latulip-Gariepy reviewed any of Mr. Gilhouse's old MARs.  She did not testify that she did so.  Under the new system of MARs, adopted in March 2001, there is no evidence that Ms. Latulip-Gariepy received and reviewed Mr. Gilhouse's MARs for May or June 2001 or was otherwise informed or aware whether he was receiving all of his prescribed medication.

Despite Plaintiff's claims to the contrary, there is no admissible evidence that Ms.

13

Latulip-Gariepy subjectively perceived facts from which she could infer that Anthony Gilhouse had not received his prescribed medication and was thus at substantial risk for suffering a fatal asthma attack. The Supreme Court has rejected arguments similar to Plaintiff's that she should have perceived a significant risk to Mr. Gilhouse's serious medical needs. *See Farmer*, 511 U.S. at 838. Accordingly, Plaintiff's § 1983 claims against Ms. Latulip-Gariepy are dismissed.

The Court now considers Plaintiff's § 1983 claims against James Garret, R.N., Health Services Administrator at Maxey and SecureCare employee.

### C. James Garrett, R.N.

Plaintiff argues that Administrator Garrett acted with deliberate indifference to Anthony Gilhouse's serious medical needs because Garrett should have known there was a significant risk that Anthony Gilhouse was not receiving or taking all of his prescribed medication and could suffer a fatal asthma attack. In support, Plaintiff presents evidence that Garrett was aware that: (1) in November 2000, Mr. Gilhouse was not using his Flovent and Serevent inhalers as often as prescribed (Garrett Dep. 96-97); (2) the old MAR system was confusing, fragmented, and the Maxey staff were not properly completing the forms thus making it too difficult to monitor whether prescribed medications were appropriately administered; (3) the old prescription reordering procedure was flawed and too difficult to monitor; (4) a PAC Pharmacy audit of the Olympic Center at Maxey on August 23, 2000 found that medications were not properly charted in the MARs (Pl.'s Ex. W, 8/23/00 audit report)[3]; and (5) the State Child Welfare Agency had cited Maxey because its staff was not

---

[3]The August 23, 2000 PAC audit report noted "many missing entries on MARs. No indication as to why doses were not given (missed or refused) or if they were, why wasn't

14

properly dispensing prescribed medicine or recording when or why that medicine was or was not dispensed (Pl.'s Ex. Y, 6/27/00 letter), and Maxey had submitted a corrective action plan providing, in part, that Garrett had agreed to monitor, on a bi-monthly basis, the Maxey Olympic Center staff as they dispensed medication (Pl.'s Ex. Z, 8/24/00 Maxey letter to State Agency).

Defendants respond that Plaintiff presents evidence supporting claims of negligence, not evidence that Administrator Garrett subjectively perceived facts from which he could infer a substantial risk to Anthony Gilhouse, that he in fact drew that inference, and then disregarded the risk. This Court agrees with Defendants.

### 1.  Knowledge About Anthony Gilhouse

Garrett was aware that Anthony Gilhouse had asthma, that he had been prescribed Serevent, Flovent, and Albuterol inhalers, and he knew what dosages Mr. Gilhouse was to take. (Garrett Dep at 96.) He was aware that Mr. Gilhouse had had asthma attacks

---

it indicated?" (Pl.'s Ex. W, 8/23/00 audit report at 4.)

   A follow-up letter was also sent to Garrett, notifying him directly that:

   Many MAR entries were missing. Were doses given or not recorded, refused by the inmate, or just not given? Compliance is important, especially with antibiotic, asthma inhalers and psychotropic drugs. A Doctor's order for Serevent every 12 hours does not mean prn. This may contribute to Dr. Brown's continually making dosage changes. She has, by the way, agreed to allow more time to elapse before making changes. The MARs being used do not have a format that is easily followed, so I have sent Anne an example of one of ours that you may find helpful. We can print these for you each month and they will contain all orders from the previous month. Each sheet can contain multiple drugs for each inmate instead of one sheet for each drug. This may reduce confusion.

(Pl.'s Ex. X, letter to Garrett.)

15

while at Maxey and had been transported to the hospital for that reason on two occasions. (*Id.* at 98.)  Mr. Garrett testified that there were intervals when Anthony was sicker than others, and he believed that Anthony was getting a very good result from the Flovent and Serevent inhalers.  (*Id.* at 103.)

Garrett believed that Anthony Gilhouse was receiving and taking his asthma medication.  (Garrett Dep. at 72.)  There was one time, however, when Anthony told him that he was refusing to take his asthma medication.  This was during a November 2, 2000 clinic visit with Dr. Parker.  Anthony complained that the Flovent tasted bad.  Garrett advised him to either rinse his mouth out with water and keep it handy when taking this medicine or to save a little juice from breakfast and use it when taking his morning dose. Dr. Parker also counseled Anthony during that visit on the importance of him taking all of his asthma medication.  Anthony told both Dr. Parker and Garrett that he would take all of his medication.  (*Id.* at 96-97.)

Other than that one time, Garrett did not recall anyone telling him that Anthony Gilhouse was refusing his medication.  (*Id.* at 97.)  He was not informed at anytime from December 2000 to the time of Anthony's death, that Anthony was not getting his prescriptions.  (*Id.* at 170-71.)  He does not recall specifically reviewing any of Anthony Gilhouse's MARs, and he did not receive a phone call or an UIR about Mr. Gilhouse refusing or not receiving his medication.  (*Id.* at 24-26, 73-74, 93.)  Although Garrett was aware of the August 23, 2000 PAC audit finding that problems with the MARs, there is no evidence that he was aware of or agreed to the corrective action proposed by the Maxey Facility Administrator to the State Child Welfare Agency on August 24, 2000.  Garrett had no other reports or facts from which to infer that Mr. Gilhouse was not receiving all of his

16

asthma medication.  Moreover, his personal observations of Anthony Gilhouse led him to

believe otherwise:

> I personally witnessed him playing basketball.  I seen [sic] him on campus.  I had
> several discussions with him.  One specific day I remember watching him walk
> out of the Mack gym with a sweaty tee-shirt, smiling, holding a basketball, having
> just completed a game.  It looked to me like he was being very comfortable.  I
> understood that he had gotten a job.  I had no reports otherwise to say that he
> wasn't getting his medication.

(*Id.* at 72.)

### 2.  Knowledge About Problems With Old MAR Forms and Monitoring of MARs

Garrett was familiar with Maxey's Standard Operating Procedures for the handling of

prescription drugs ("SOP 4013") and the various responsibilities it set out for Maxey

employees ("Shift Supervisors, Youth Specialists, Program Managers") and SecureCare

employees ("Health Services").  (Garrett Dep. at 75-76, 78-81, 92-93, 149-53.)

SecureCare, identified as "Health Services" in SOP 4013, was to order all drugs

prescribed by Dr. Parker through the pharmacy contractor, PCA-Corrections.  SecureCare

was also responsible for assuring that the medications were received and delivered to the

appropriate Maxey staff.

Maxey employees, called Youth Specialists, were responsible for providing each dose

of medication to juvenile residents, for documenting each dose received or refused on a

medication administration record ("MAR"), and for notifying their supervisors if residents did

not take their medications via an unusual incident report ("UIR").

Maxey Supervisors were responsible for reviewing the UIRs on a daily basis and for

notifying Maxey superiors and SecureCare staff about UIRs.

Maxey's residence hall Program Managers were responsible for weekly audits of the

17

MARs and for taking necessary and appropriate actions when records were incomplete or indicated non-delivery.  These actions included notifying SecureCare staff.

Maxey Shift Supervisors were also responsible for regular audits of the MARs to check for completeness and were to take the same actions as Program Managers if medications were not being delivered.  (Pl.'s Ex. HH, Dr. Greifinger Expert Report at ¶¶42-45; Pl.'s Ex. N, SOP 4013.)

"When medications are finished, discontinued, dose-adjusted, or [a] youth is released," Maxey Youth Specialists must complete MARs.  These MARs are then turned over, along with medication containers and any leftover medication to Health Services.  SecureCare employees in Maxey Health Services were required to complete a UIR if the drug quantity they received did not match that listed on the MARs.  (Pl.'s Ex. N, SOP 4013 at 7.)

As described above, Maxey staff turned the MARs over to Health Services, along with empty medication packages or packages with unused medication (including inhalers).  (Garrett Dep. at 77.)  It was at this tail-end of the MAR review process that Garrett became involved.  (Garrett Dep. at 149-50.)

Sporadically, about every week, Health Services would receive a varying number of MARs and drug containers for a varying number of the Maxey residents taking prescribed medications.  Sometimes the MARs were with their correlating medication container and/or unused medication.  Sometimes they were not.  If they were together, Garrett reviewed both to see if the information on the MAR matched up with the returned medication/container.  If there was a discrepancy and the form indicated that not all doses were given to the Maxey resident, then Garrett or L.P.N. Latulip-Gariepy would notify either

18

the Maxey Program Manager or Shift Supervisor by making a phone call or filling out a UIR. Often, if a problem was identified, they would call over to the Maxey residence hall and ask for an explanation. They did not always get a meaningful response. The predominant problem they found, however, was not discrepancies indicating that prescribed drugs were not given. Rather, the opposite was true – they would receive empty drug packages but would discover there were not corresponding entries on the MAR showing when the prescribed medicine was administered to the youth. (Garrett Dep. at 70, 91, 94, 150-153.) This indicated that the prescribed drugs were given but not properly recorded. Garrett explained that, because the SOP 4013 process called for multiple, concurrent daily levels of audit by Maxey staff and if Health Services did not receive notice via a phone call or UIR otherwise that a resident was having a medication problem, then it was reasonable to conclude that errors on the MARs were clerical rather than errors in medical administration. (Garrett Dep. at 91-93.) This is why he did not see it as a high priority to match up each MAR received with each returned medication container. (Garrett Dep. at 73-76.)

It is undisputed that Garrett was displeased with the old MAR forms. Because a separate MAR form was used for each drug prescribed for the same Maxey resident (and sometimes a separate form for each dose), he found the MAR forms and medical administration recording process confusing, fragmented, fraught with error, and difficult to perform a comprehensive audit so as to ascertain the accuracy of entries, whether and when Maxey staff had administered a prescription drug, or whether a prescription drug needed to be refilled.[4]

---

[4]Athough some asthma inhalers are stocked at the Maxey residential units, the reordering process was triggered by notice from the Maxey staff to Health Services. (Pl.'s

Garrett was also displeased that the Maxey staff responsible for giving the medication to Maxey residents failed to properly complete the MAR forms.  Maxey employees, known as Youth Specialists, were responsible administering the drugs to residents, for recording the date and time medication was given, and for initialing the entry.  He found it impossible to determine who was failing to initial and record the required information.  (Garrett Dep. 36-39, 40-42, 46-48, 70, 90-91, 172; Pl.'s Ex. U, Garrett Stmt.[5] at 3-5, 11, 14, 21-22, 24, 26-27, 35.)

Garrett complained to others about these problems with the old MAR forms and the medication administration recording process.  He discussed it with SecureCare employees Latulip-Gariepy, Dr. Parker, and Brian Shield.  (Garrett Dep. at 54, 64, 66-70.)  He did not discuss it with SecureCare's President, Ms. Kathy Laginess.  (Garrett Dep. at 59, 81.)

Principally, however, he repeatedly complained about these problems to key Maxey personnel, Stacey Frisinger, Director of Clinical Services, and Roy Yaple, Quality Assurance Manager.  He told these Maxey individuals that they needed to change the MAR system and that he believed the old MARs forms presented a potentially dangerous problem.  Mr. Yaple responded that if Maxey staff was not following the procedures set out in SOP 4013, then they would be subject to discipline.  Garrett, however, had no way of telling which specific Youth Specialist failed to make an entry after the fact. He followed up with Mr. Yaple at a latter date, telling him that the problem persisted and that he did not know how to cure it.  (Garrett Dep. at 40-48, 78-79, 147.)

---

Ex. U, Garrett Stmt. at 3-5.)

[5]Contrary to Defendants' arguments, Garrett's Statement contains admissions by a party opponent and thus are not inadmissible hearsay.  Fed. R. Evid. 801(d)(2)(A).

Garrett also had frequent meetings with Stacey Frisinger about these problems. He also advised Ms. Frisinger that he suspected that Maxey residents' medications were not always being dispensed as prescribed.  In addition, because the old MAR forms were coming back incomplete and incorrect, Garrett told Ms. Frisinger that he suspected that Maxey personnel that were responsible for regularly reviewing the MARs were not doing so.  Ms. Frisinger agreed with him that the problems needed correction and that she would make a report at the Maxey Center Directors' meeting.  Garrett followed-up with her, and they had multiple conversations.  He told her that the problems were continuing, and she told him repeatedly that she was reporting it.  Garrett continued to raise the issue with her on a monthly basis, and ultimately suggested to her that they pilot new a new MAR form that was supplied by PCA Pharmacy.[6]  The new forms put all medications for a Maxey resident on one form, required simpler entries, and were easier to audit.  With the new forms, there was also a change in reordering of monthly medications.  They were now automatically reordered so as to arrive on the first of each month.  When the new MAR forms went into effect, Garrett personally trained numerous Maxey staff how to use them. The new MAR forms were first used at a Maxey housing center starting in March 2001.  It

---

[6]Ms. Frisinger, Agency employee and Maxey's Director of Clinical Services, admits that Garrett told her about the difficulty of reconciling MARs with the medications returned from the various Maxey units, but does not recall when those conversations took place. (Defs.'s Reply Ex. 12, Frisinger Dep. at 108-12.)  She does not remember if Garrett discussed with her the need for a new MAR form.  (*Id.* at 110-11.)  She does recall Garrett having complaints but does not recall what they were or how they followed up.  (*Id.* at 30, 92.)  She acknowledges that she wrote a memo on August 30, 2000, regarding issues discussed with Jan Epps, State Corrections Department, on that date.  At the bottom of the memo, she wrote that she and Garrett were currently working on or talking about several of the areas discussed on that date.  She could not recall, however, what she meant by that statement.  (*Id.* at 110-111, 124-25 ; Defs.' Reply Ex. 11, 9/5/00 memo from Frisinger to Maxey officials documenting conversations with Garrett.)

was first used at the Olympic Center, where Anthony Gilhouse was housed, in May 2001. Anthony Gilhouse's May 2001 MAR was not returned to Health Services before he died. It was retrieved from his residential hall after his death.  (Garrett Dep. at 24-25, 57-62, 78-85; Pl.'s Ex. U, Garrett Stmt. at 5-10, 15-20.)

Despite arguments to the contrary, Plaintiff does not present evidence establishing the subjective component of the deliberate indifference test.   At best, Plaintiff presents evidence of negligence or breach of contract.   There is no evidence from which a reasonable jury could conclude that Garrett strongly suspected and refused to verify that Anthony Gilhouse was not getting his required asthma medication.  *See Comstock*, 273 F.3d at 703.  Likewise, there is no evidence from which a reasonable jury could conclude that Garrett had knowledge of a substantial risk of serious harm to Maxey residents generally from which to infer a substantial risk to Anthony Gilhouse's serious medical needs, drew that inference, and then disregarded that risk.  Accordingly, Plaintiff's § 1983 claims against Garrett are dismissed.

The Court now considers Plaintiff's supervisory liability claims against Kathy Laginess, President of SecureCare.

### D.  Kathy Laginess, President of SecureCare

Plaintiff argues that Ms. Laginess is liable for a violation of Anthony Gilhouse's constitutional rights because she personally failed to adequately conduct MAR reviews and because of her role as a supervisor over the other SecureCare employee Defendants.  This Court agrees with Defendants.  Plaintiff does not present evidence establishing supervisory liability.

As the Sixth Circuit observes, "[a] supervisory employee cannot be held liable under

section 1983 for the constitutional torts of those he supervises unless it is shown that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 727 (6th Cir. 1996) (internal quotations and citation omitted). Moreover, "[s]upervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act." *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006) (internal quotation and citations omitted), *cert. denied sub nom., Tarter v. Gregory*, ___ U.S. ___, 127 S. Ct. 962 (2007).

Plaintiff does not satisfy the requirements for establishing supervisory liability. Plaintiff argues that Laginess's failure to set up routine use of peak flow meters when evaluating asthma patients is akin to the facts in *Hill v. Marshall*, 962 F.2d 1209 (6th Cir. 1992). Plaintiff is mistaken. In *Hill*, the Sixth Circuit concluded that the plaintiff had presented evidence supporting his claim that the defendant supervisor personally ignored complaints about his medication. *Id.* at 1213. The plaintiff also claimed that the supervisor defendant had abandoned "the specific duties of his position – reviewing and responding to inmates' complaints about medical needs – in the face of actual knowledge of a breakdown in the proper workings of the department." *Id.* The supervisor "*personally* had a job to do, and he did not do it. His failure to do his job resulted directly in a violation of the plaintiff's Eighth Amendment right." *Id.* Here, there is no evidence that it was Defendant Kathy Laginess's specific duty to review MARs or to assure that routine peak flow monitoring was performed on asthmatic residents at Maxey. There is no evidence that she failed to personally perform duties in the face of actual knowledge of a breakdown in departments under her supervision that had any such responsibility. There is no evidence that Ms. Laginess was personally involved in Anthony Gilhouse's healthcare at Maxey or had any

23

involvement with him.  (Defs.' Reply Ex. 10, Laginess Aff. ¶¶ 4-5.)

Plaintiff also attempts to show supervisory liability by relying on *Young v. Martin*, 51 Fed. App'x 509 (6th Cir. 2002).  Plaintiff's attempt fails.  In *Young*, the plaintiff claimed that the defendant, a former director of Michigan's Department of Corrections, "implemented a policy which only granted minimal care to inmates with chronic illnesses." *Id.* at 515.  The Sixth Circuit held that the defendant was not entitled to qualified immunity because "[i]f Plaintiff can prove that Defendant, who was responsible for implementing policy for the MDOC, implemented a policy that set forth only minimal standards of health care for inmates with chronic or long-term serious illnesses knowing that in doing so he was creating a substantial risk of harm to inmates, then this would tend to show that Defendant Martin at least implicitly approved unconstitutional conduct of his subordinates, who provided the actual health care." *Id.*  Unlike the claims in *Young*, there is no evidence here that Ms. Laginess was responsible for implementing a policy that led to the failure of Maxey residents receiving their prescribed medication.  Ms. Laginess avers that she was not aware in 2001 that any Maxey residents were not routinely receiving their prescribed medication.  Likewise, she avers that she was unaware of the MDCIS Investigative Reports and responsive corrective plans submitted by Maxey nor was SecureCare's input ever sought concerning the issues raised in the reports.  (Laginess Aff. at ¶¶ 6-7.)

Plaintiff's reliance on *Taylor v. Michigan Department of Corrections*, 69 F.3d 76, 81 (6th Cir. 1995), is also misplaced.  As the Sixth Circuit recently clarified, "[t]he *Taylor* panel had before it a defendant prison warden whose individual responsibility was to insure all prisoner transfers did not risk inmate safety.  By failing either to establish a reasonable system to review prisoner files before transfer, or review them himself, the warden

approved transfers which directly affected prisoner safety and thereby resulted in violations of prisoner's Eighth Amendment rights." *Gregory*, 444 F.3d at 752 (internal citations omitted). In *Taylor*, the plaintiff presented evidence "that it was the *active performance* of the defendant['s] individual job function which directly resulted in [his] constitutional injury." *Id*. Plaintiff here presents no evidence that Ms. Laginess, in the active performance of her individual job functions, caused Anthony Gilhouse to suffer a constitutional injury. Accordingly, Plaintiff's § 1983 claims of supervisory liability against her are dismissed.

The Court now addresses Plaintiff's final § 1983 claim against SecureCare, Inc.

### E.  SecureCare, Inc.

Plaintiff argues that SecureCare had a policy: (1) not to address issues of medication dispensing in Maxey's residential centers; (2) not to put MARS in residents' charts; (3) not to review MARS to assure residents are getting their prescribed medication or to assure that it is being reordered; (4) not to follow SOP 4013; and (5) not to perform regular peak flow measurements of asthmatic residents. Plaintiff further argues that these policies caused the alleged deprivation of Anthony Gilhouse's constitutional rights. Defendants respond that there were no such policies and furthermore than Plaintiff cannot show that any of its policies, practices, or procedures caused a deprivation of Anthony Gilhouse's constitutional rights. This Court agrees that Defendant SecureCare is entitled to summary judgment in its favor. Absent evidence showing that Anthony Gilhouse suffered a constitutional violation at the hands of the other Defendants, there can be no finding of § 1983 liability against Defendant SecureCare. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (*per curiam*) (holding that "[i]f a person has suffered no constitutional violation at the hands of the individual police officer, the fact that the departmental

25

regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.")  *See also Bowman v. Corrections Corp. of America*, 350 F.3d 537, 545-46 (6th Cir. 2003) (affirming the district court's decision that "without a constitutional violation of [the deceased prisoner]'s Eighth Amendment right" by anyone, then the private corporation charged with providing medical services to inmates "cannot be held liable for its policy, even if it were to encourage deliberate indifference.")  Accordingly, Plaintiff's § 1983 claims against Defendant SecureCare are dismissed.

## IV.  Conclusion

For the above-stated reasons, Defendants' motion for summary judgment is GRANTED.   The claims asserted in Plaintiff's complaint are DISMISSED WITH PREJUDICE.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  April 24, 2007

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on April 24, 2007, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager

26